Claudia **HESSEN**, Arnold Hessen, for Use and Benefit of **ALLSTATE INSURANCE CO.**, Plaintiffs–Appellees,

v.

**JAGUAR CARS, INC.**, a Delaware Corporation, Defendant-Appellant.

No. 89–5938.

United States Court of Appeals, Eleventh Circuit.

Oct. 24, 1990.

R. Benjamine Reid, Paul L. Nettleton, Kimbrell & Hamann, P.A., Miami, Fla., for defendant-appellant.

Christopher Lynch, Miami, Fla., for plaintiffs-appellees.

Before FAY and BIRCH, Circuit Judges, and HENDERSON, Senior Circuit Judge.

FAY, Circuit Judge:

Defendant–Appellant Jaguar Cars, Inc. ("Jaguar"), appeals a jury award of damages in favor of Allstate Insurance Co. ("Allstate"). Allstate sued Jaguar in a products liability action as subrogee of Arnold and Claudia Hessen, homeowners in Dade County, Florida. Jaguar argues that the district court erred in failing to direct a verdict or grant judgment notwithstanding the verdict for Jaguar, and asserts that Allstate did not offer any competent evidence of recoverable damages, or establish any evidence that the defect alleged was the factual cause of the damages claimed. Jaguar also argues that the district court abused its discretion in admitting evidence of a Jaguar recall campaign, as well as evidence of complaints in vehicles other than the subrogors' car. Finally, Jaguar appeals the district court's refusal to exclude the testimony of plaintiffs' expert based on plaintiffs' allegedly purposeful destruction of evidence. We AFFIRM the district court's rulings on all grounds.

## FACTS AND PROCEDURAL HISTORY

This appeal involves issues arising from a products liability action based on an allegedly defective 1980 Jaguar XJ6 automobile distributed by Jaguar and purchased by Arnold and Claudia Hessen, Allstate's insureds. On October 9, 1984, the vehicle caught fire while Claudia Hessen and her housekeeper were sitting in the car preparing to drive out of the Hessens' garage. The fire spread, resulting in extensive property damage to the Hessens' house, as well as the garage.

The Hessens were insured under a homeowner's policy issued by Allstate. Immediately following the fire, Arnold Hessen notified both Allstate and Jaguar. Allstate responded right away, sending two experts who conducted a detailed inspection of the vehicle, attempted to assess the extent of the damage, and determined that a "bad fuel hose" was the probable cause of the fire. Jaguar also responded, sending a district service manager to the Hessens' home who very briefly inspected the vehicle visually and recorded its mileage and identification number.[1] Arnold Hessen testified that the district service manager told him that he wasn't concerned with what Hessen did with the vehicle. Subsequently, Hessen received a letter from Jaguar expressing sympathy over the accident, but advising him that on the basis of the district service manager's "investigation," as well as the car's mileage and service record, Jaguar did not consider itself in any way responsible for the fire.

Following apparently considerable negotiations between Hessen and Allstate, involving the submission of detailed lists regarding damaged items and their costs, Allstate paid Hessen the total sum of $385,-654.19 to repair or replace damaged lost items, including the home, and to reimburse the Hessens for costs generated for a rental property pending the repairs. Allstate then brought a subrogation action against Jaguar based upon claims of negligence, strict liability, and breach of implied warranty. Allstate alleged that the fire to the Hessens' home was caused by a defective fuel line system in the Hessens' 1980 Jaguar XJ6 vehicle.

Jaguar filed a pretrial motion to dismiss, or, in the alternative, a motion to exclude Allstate's evidence as to the alleged defective parts, claiming that plaintiffs had intentionally destroyed the fuel hoses and other components of the fuel injection system that plaintiffs claimed were defective, thereby precluding Jaguar from preparing an adequate defense. The district court denied the motion, finding it "wholly lacking in merit." Jaguar renewed the motion at trial in an attempt to exclude the testimony of Allstate's expert, but the motion was again denied.

Jaguar also filed a motion in limine to exclude evidence of a recall campaign of 1980 Jaguar XJ6 Series III automobiles (the same model as the Hessens' car), arguing that any evidence of the recall was irrelevant because the recall pertained only to vehicles manufactured after the vehicle in question.[2] Further, Jaguar argued that the Hessens' vehicle did not contain the potentially defective material in the fuel hoses which it claimed precipitated the recall. The district court denied Jaguar's motion "without prejudice." When the motion was renewed, the court again denied it "provisionally," but ruled that Allstate could make no reference to the recall campaign in front of the jury until it established in its case in chief, "through circumstantial evidence or otherwise, that the alleged defect in this case is the same as that giving rise to the recall." (R6–124 at 2).

At trial, Allstate attempted to establish that the manner of connection of the fuel hose to the fuel injector system in the Hessen vehicle was defectively designed, and that this defect was the proximate cause of the fire. Allstate's entire case on these issues was presented through its expert. During the expert's testimony, the district court permitted the introduction of

---

1. Jaguar does not dispute Arnold Hessen's estimation that the inspection lasted not "more than two minutes" (R7–54).

2. The Hessens' vehicle was manufactured one month prior to the first of the recalled vehicles.

evidence concerning the recall campaign,[3] as well as evidence of other complaints of leaks or fuel odors in Jaguar vehicles. This evidence was admitted over Jaguar's objections asserting a lack of substantial similarity to the Hessen vehicle in condition and alleged defect.

Several other witnesses testified during the trial, including the Allstate adjuster, Barry Nedelman, who had handled the Hessens' claim. Nedelman testified that the total payout to the Hessens in compensation for the damages incurred as a result of the fire was $385,654.19. Asserting that this was the only evidence relied upon by Allstate to prove damages, Jaguar moved for a directed verdict both at the end of Allstate's case in chief and at the conclusion of all evidence, contending that Allstate had failed to present any evidence that established a proper measure of recoverable damages sufficient to support a jury verdict. The motions were denied.

The case was ultimately submitted to the jury, which returned a verdict in favor of Allstate. Curiously, although the jury found no comparative negligence on the part of Allstate or the Hessens, it nevertheless awarded only 75% of Allstate's total claim, or $289,240.64. The court entered final judgment in this amount on May 12, 1989. Jaguar's timely post-trial motions for judgment notwithstanding the verdict and for new trial on five separate grounds, largely reiterating objections made earlier in the proceeding, were denied by a district court order entered July 31, 1989. The court entered a final judgment awarding Allstate prejudgment interest on August 21, 1989. This appeal from both final judgments followed.

## STANDARD OF REVIEW

Motions for judgments notwithstanding the verdict and directed verdicts test the sufficiency of evidence supporting a jury verdict. *Gregg v. U.S. Industries, Inc.,* 887 F.2d 1462, 1468 (11th Cir.1989) (citing *J & H Auto Trim Co. v. Bellefonte Ins. Co.,* 677 F.2d 1365, 1368 (11th Cir.1982)). Because consideration of the sufficiency of the evidence is a question of law subject to de novo review, we therefore apply the same standard as the district court applied in its initial rulings. *Id.* When evaluating the district court's denial of a directed verdict or judgment n.o.v., the court

should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the [c]ourt believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969).[4]

Motions for a new trial are within the sound discretion of the district court, *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984), and our review of a district court's denial of a new trial in-

---

3. In so doing the court found that "the current trend in the law is in favor of admissibility of such evidence rather than the exclusion of evidence":

   Although I find this evidence prejudicial, and obviously it is not—doesn't fairly completely fall within a perfect example of the exceptions to the allowance of this evidence, it seems to me that the more appropriate way to handle this would be to allow the—to admit the evidence and let counsel, as he has done in the proffer, through cross examination, destroy the credibility of this evidence if defense

counsel is able to do so. I thought the cross examination was good. Counsel insures [SIC] me it's going to be better if he has to deal with it.

   I believe it's appropriate to allow it to go to the jury.
   (R8–33).

4. The Eleventh Circuit in *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

volves determining whether the trial judge clearly abused his/her discretion. *Gregg*, 887 F.2d at 1469; *Pate v. Seaboard R.R.*, 819 F.2d 1074, 1077 (11th Cir.1987). Similarly, a district court's evidentiary rulings are discretionary and will not be disturbed absent a clear showing of an abuse of discretion. *U.S. v. Pendas–Martinez*, 845 F.2d 938, 941 (11th Cir.1988); *Rainey v. Beech Aircraft Corp.*, 784 F.2d 1523, 1529 (11th Cir.1986), *reinstated after rehearing en banc*, 827 F.2d 1498, 1499 (11th Cir. 1987), *rev'd in part on other grounds*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988).

## DISCUSSION

### I. *Competent Evidence of Damages.*

■ In this diversity case, the determination of damages constitutes a substantive issue. *Complete Concepts, Ltd. v. General Handbag Corp.*, 880 F.2d 382, 389 (11th Cir.1989); *McDermott v. Middle East Carpet Co.*, 811 F.2d 1422, 1426 (11th Cir.1987). Thus, our inquiry, in light of the standard of review set forth above, is whether, as a matter of Florida law (which controls the substantive claims in this case), the evidence considered in the light most favorable to Allstate supports the award of damages in its favor. *See Complete Concepts*, 880 F.2d at 389.

Jaguar argues that at trial, Allstate relied entirely upon testimony of its adjuster Nedelman to establish its claim for damages, and that therefore Allstate's evidence on the damages claim was wholly insufficient as a matter of law to support the jury's verdict. Jaguar premises its argument on *Port Everglades Auth. v. R.S.C.*

*Industries*, 351 So.2d 1148 (Fla. 4th DCA 1976), a case it views as directly on point and controlling on this issue.

In *Port Everglades*, a property lessor brought an indemnification action on behalf of its fire insurance carriers to recover monies from a tortfeasor that had been paid by the insurers in compensation for a fire loss.[5] At trial, the only evidence offered concerning damages was testimony as to the total payments that the carriers had distributed to the insured.[6] In affirming the trial court's dismissal of the action, the reviewing court reasoned that simply because a contractual provision gives an insurer a right of recovery against a third party does not mean that the insurer has "carte blanche to recover any sum which suits its fancy." *Id.* at 1150. Rather, the "recovery must be reasonable, based upon the accepted measure of damages." *Id.* Because the appellant failed to prove that the amount it received from its carriers was reasonable, the trial judge's dismissal of the case was proper. *Id.*

In this case, Jaguar argues in a similar vein that Allstate failed to present any evidence concerning the reasonableness of the amount paid to the Hessens, or any method by which the damages could be appropriately calculated, other than the "naked assertion of Allstate's adjuster as to the amount paid on the Hessen claim." *Initial Brief of Appellant* at 32. We disagree.

This case is factually distinguishable from *Port Everglades*. Here, the jury was not simply confronted with a bald numerical figure. It considered testimony regarding the assessment of the damages claim,[7] as well as testimony regarding the actual

---

**5.** The *Port Everglades* court recognized that the fire insurance carriers were the real parties in interest, and that they stood "in the shoes" of the property lessor vis a vis the parties against whom the damages claim was being made. 351 So.2d at 1149.

**6.** The court observed:

At trial appellant proved: the indemnification agreement; the occurrence of a fire loss; and payments to appellant totalling $9,184.08 from appellant's insurance carriers. Appellant adduced no proof as to the amount of loss occasioned by the fire other than payments totalling $9,184.08. There was no com-

petent evidence that that sum represented the proper measure of damages or that the sum in question, or any sum, was reasonable payment for the fire loss.
*Port Everglades*, 351 So.2d at 1149.

**7.** Nedelman, the property adjuster employed by Allstate to "take care of" the fire loss sustained by the Hessens (called by Jaguar as an adverse witness), testified to the fairly extensive procedures to which Allstate required the Hessens to submit during Allstate's calculation of a sum for compensation. Pursuant to the applicable policy provisions, Allstate required Arnold Hessen to itemize all damaged articles and make lists of

damages to the subrogors' home and its contents.[8] Allstate also introduced photographs of the home that outlined the extent of the fire damage (R7–47–48, 86). Most important, the jury considered the figure given by adjuster Nedelman, characterized by counsel as the total amount of money spent by Allstate to "make Mr. Hessen whole" (R8–110), in light of Hessen's testimony that, notwithstanding the considerable negotiations between Allstate and Hessen regarding items covered, Allstate was "right" regarding the items of damage for which they paid. Hessen testified that he felt that he had been "treated ... fairly" by the insurance company with regard to the monies offered him in compensation for his loss. (R7–52).

This court has recognized on several occasions that in Florida, an owner of property is qualified to testify as to its value for purposes of supporting a damages award. *Gregg*, 887 F.2d at 1469; *Electro Servs., Inc. v. Exide Corp.*, 847 F.2d 1524, 1526 (11th Cir.1988); *Neff v. Kehoe*, 708 F.2d 639, 644 (11th Cir.1983); see *Trailer Ranch, Inc. v. Levine*, 523 So.2d 629, 632 (Fla. 4th DCA 1988); *Hill v. Marion County*, 238 So.2d 163, 166 (Fla. 1st DCA 1970). This in effect is what Arnold Hessen did in confirming that "all in all," he felt that he had been treated "fairly" with regard to the procedures and compensation provided him by Allstate in valuing the various elements of his fire loss—a valuation subsequently given concrete form by adjuster Nedelman in reciting Allstate's total payout to Hessen.[9] This valuation was freely open to attack by Jaguar through cross-examination and the submission of indepen-

___

the same, along with the actual cash value of the items and the amount claimed as a loss. (R8–150–52). Indeed, at one point the following colloquy took place between Nedelman and counsel for Jaguar:

Q: Before Allstate Insurance Company would pay Mr. Hessen's claim, he had to submit list upon list of things that talked about two packages of soap worth three dollars each and socks. List after list of what things cost. You required all of that of Mr. Hessen before you paid him, didn't you?

A: Yes, sir.

(R8–160). In addition, Hessen was required to give Allstate any available proof, i.e. bills, invoices, etc., of the original cost or cost of repair of any damaged items (R8–151–52); to document all costs and expenses incurred to maintain the Hessen family standard of living in rental property while the home was being repaired (R8–152, 165); and to give Allstate complete access to the property and damaged goods for inspection purposes (R8–152–53). If damaged property could be repaired to the satisfaction of the insured it would be, if not the insured would receive the value of property at the time it was damaged. (R8–165). With respect to the home, Allstate repaired the considerable damage and paid for these repairs. (R8–166).

8. At trial, Arnold Hessen testified that the entire left side of the home was burned, including two bedrooms and the garage (R7–37), and that virtually all personal property in the home was destroyed, either because of direct fire damage or smoke damage (R7–48–49). Hessen also testified that Allstate immediately investigated the loss, obtained a rental property for the Hessens, and paid the rent while the home was being repaired (R7–49–50); that the Hessens attempted to clean all of their clothes, and anything that couldn't be restored was paid for (R7–48–

50); and that Allstate restored paintings and carpet in the home. (R7–51–52).

9. Put another way, if Hessen had testified on direct examination, "My house and personal property are worth $385,654.19," such testimony would clearly satisfy Allstate's burden of proving damages. Once again, this is because under Florida law, an "owner of property is competent to testify regarding its value. The weight of such testimony is, of course, affected by the owner's knowledge of circumstances which affect value, and as an interested witness, it is for the jury to evaluate the credibility of his testimony.'" *J & H Auto Trim Co. v. Bellefonte Ins. Co.*, 677 F.2d 1365, 1369 (11th Cir.1982) (citation omitted).

In this case, Hessen's above hypothetically acceptable testimony was simply broken down into two steps. First, Hessen testified essentially that he agreed that Allstate's estimate of his damages was a reasonable or satisfactory compensatory amount, that the company had operated fairly in adjusting his claim:

I don't have great complaints with Allstate. They didn't want to pay everything and we had arguments at times, I'll tell you. Mr. Needleman [SIC] and I, he would just say certain things weren't covered in the policy and he could not give them to me. And I would yell and scream at him because I don't like to take no for an answer because I'm a lawyer and I have been around and I would argue with him.

On the points we could settle, we settled. On the points that were not covered, they didn't pay for it. And I didn't sue them because they were right. So all in all, they treated me fairly, and I really don't have any great complaints looking back on the whole experience.

dent evidence refuting its accuracy. *See Neff,* 708 F.2d at 644.

In sum, the evidence regarding the physical property damage sustained and Allstate's extensive claims procedures in seeking to calculate that damage, as well as Arnold Hessen's direct testimony acknowledging fair treatment after Allstate reached a final figure, offered *in addition to* the total amount paid, provided the jury with a sufficient basis to reach an accurate determination as to the reasonableness of the payment made by Allstate to the insureds as compensation for their loss. The jury, in accordance with its fact-finding function, apparently determined this interplay of damages evidence to be for the most part credible.[10] We therefore refuse to overturn the district court's refusal to grant judgment n.o.v. on this ground.

## II. Causation.

■ Jaguar also maintains that Allstate failed to establish by any competent evidence that the defect alleged was the factual cause of the damages claimed. Florida has adopted a preponderance standard for causation in both negligence and strict lia-

bility actions; a mere possibility of causation is not enough. *See Gooding v. Univ. Hosp. Bldg., Inc.,* 445 So.2d 1015, 1018 (Fla.1984) (Florida courts follow "more likely than not" standard of causation in negligence actions); *West v. Caterpillar Tractor Co.,* 336 So.2d 80, 90 (Fla.1976) (ordinary rules of causation applicable to negligence actions apply under Florida's adoption of strict products liability).

At trial, Allstate offered all of its evidence concerning defect through its expert, Julian Nowak. Jaguar argues that although Nowak testified that the probable cause of the fire was a fuel leak from "either the fuel hose or the fuel hose connection," Nowak expressly testified that he was unable to determine what caused the fuel leakage with any reasonable degree of probability, observing that "[t]here were a number of possible candidates" for the cause of the leak. On the other hand, Allstate contends that Nowak presented sufficient evidence that the vehicle was defective, and that the defect was the proximate cause of the fire.[11]

Considering Nowak's testimony in the light most favorable to Allstate, we agree

(R7–52) (testimony of Arnold Hessen). Then, the jury heard testimony from Nedelman as to the actual amount of the final estimate, namely, $385,654.19. We think that this combination of testimony was enough to satisfy Allstate's burden of proof on the damages issue.

10. Although we hold that in considering the $385,654.19 total payout figure as evidence of plaintiffs' damages, *sufficient evidence was* presented for the jury to assess the figure's reasonableness (in accordance with the principle emphasized in *Port Everglades* ), we are nevertheless troubled by the ultimate damages figure awarded to Allstate by the jury in this case. We are unable to discern any factual or evidentiary basis from the record that justifies the 75% of Allstate's total claim ($289,240.64) that the jury apparently determined was the proper award of damages. We realize that both parties may have had strategic considerations militating against challenging the evidentiary bases for the amount *actually* awarded to Allstate. But because the issue was not briefed by either party *or* raised at oral argument, we decline to revisit the jury's award on that ground.

11. Nowak's exact testimony was as follows:
Q: Have you seen the photograph taken by the fire department of the fireman pointing to the engine?

A: Yes, I did, sir.
Q: The jury will have an opportunity to see this when they retire to the jury room.
Are you in agreement that the area depicted by the gentleman's hand is the origin of the fire?
A: That indicates the point of origin at the No. 3 injector.
Q: Now, based upon your review of the vehicle, what did you next do after examining the vehicle to determine whether or not—what the cause of this fire was?
A: At that point, of course, we had looked at the vehicle. The fuel hose in the direct area of origin was totally destroyed. Most of it was consumed. There were some small remmants [SIC] that were underneath one of the upper clamps. However, they were too badly damaged to do anything in terms of making any type of formal analysis of that material.
So from that point we interviewed the participants, those that had knowledge of the vehicle, to determine what symptoms were present and what prior repairs had been conducted on the vehicle. Ultimately, we were provided with the repair records on the vehicle and were advised of the scenario of events that occurred on that day.
Q: Were you able to form an opinion, within a reasonable degree of mechanical certainty,

with the district court's finding that plaintiffs "offered evidence as to both the existence of defect and the defect as the cause of the fire." Nowak testified: 1) that he considered the design of the fuel injector system, specifically the connection method of the rail and the hose to the No. 3 injector, to be defective; 2) that he based this opinion upon examination techniques that indicated that "this particular system is subject to a lot of potential deterioration"; 3) that as a result of such deterioration, the system that distributed the fuel from the rail to the injector of the Hessen vehicle made it prone to rupture or leak; and 4) that the cause of the fire was leakage from either the fuel hose or the fuel hose connection at the No. 3 injector. Although counsel for Jaguar attempted to establish other causes for the fire,[12] the jury apparently concluded on the basis of Nowak's testimony that it was more probable than not that the defective connection caused the fuel leakage and the fire. Because enough evidence was presented on causation such that reasonable minds could differ as to the cause of the fire, the district court's denial of a directed verdict or judgment n.o.v. on this ground was proper.[13]

### III. The Recall Evidence.

■ Jaguar next charges that the district court abused its discretion by admit-

based upon your examination and your review of the other materials that you described as to what it was specifically that caused this fire, what process caused this fire?
A: The process, yes, we were able to determine. The specific failure we were not able to identify precisely because of the destruction of the material. There were a number of possible candidates....
Q: Give me within reasonable probability the causes, or there be more than one, that you believe existed and caused this fire....
A: The cause of the fire was leakage from either the fuel hose or the fuel hose connection at the No. 3 injector....
Q: Again, state for me what—how you described it as a—the origin being a loose connection at the where?
A: It is not necessarily a loose connection. There was a deterioration in this system that distributes the fuel from the rail to the injector. There are a number of different things that can go wrong to create that rupture or the leakage.
Q: Do you have an opinion, sir, within a reasonable degree of mechanical certainty, as to whether the design of this fuel injector system as regarding the connection of the rail and the hose to the No. 3 injector is defective?
A: Yes, I do have such an opinion.
Q: What is that opinion?....
A: My opinion is that the connection is defective, the connection method, the design.
Q: What is the basis for your opinion in that regard?
A: There are a number of different bases for the opinion, many of which fall back from my area of responsibility that was beyond what we talked about in qualifications.
One of my responsibilities at Ford was to evaluate designs for possibilities that things might go wrong with it beyond the requirements of the Federal standard. In fact, when I was working for the automotive safety of-

fice, we were trained in a number of disciplines and became familiar with others.
Failure mode and effects analysis was the system we used at Ford to make those determinations. GM used a different system called trinalysis. All these techniques had been around and in use to a greater or lesser extent in industry starting with the aircraft industry in the middle sixties, early to middle sixties. During the early to middle seventies they became quite well known and used within the automotive industry.
So at that point we looked at the things that could go wrong with the system to determine whether a design would be acceptable. Among other things we were looking for, the possibilities of misinstallation, removing to the extent possible the chances of a mechanic doing something wrong, looking at the environmental things that affect the integrity of a connection and the acceptability of a particular hose, design and material, and the connection of those components. Those indicated that this particular system is subject to a lot of potential deterioration from each of those factors.
Q: Do you believe it to be unreasonably dangerous the way its designed?
A: Yes, I do.
(R8–40–46) (objections omitted).

**12.** During cross-examination of Nowak, for example, counsel for Jaguar tried to suggest that the fact that the fuel tank had been replaced on the Hessen vehicle could account for the presence of gas fumes. *See* (R8–71).

**13.** Because we find Nowak's testimony to constitute sufficient evidence of causation to vindicate the jury's finding and the district court's ruling, we find it unnecessary to consider whether there existed in this record sufficient circumstantial evidence to justify the inference of a *prima facie* case of "product defectiveness" for

ting evidence of a Jaguar recall campaign. Throughout the trial, Jaguar argued that evidence of the recall was irrelevant and prejudicial, since the Hessen vehicle was not specifically included within the recall. Nevertheless, the district court properly held that if Allstate could show that the defect alleged in the Hessen vehicle was the same as the defect involved in the recall, then evidence of the Jaguar recall campaign would be admitted for jury consideration. (*Order on Motions to Exclude,* April 13, 1989).[14]

Jaguar's recall was motivated by the discovery of a defect in a range of 1980, 1981 and 1982 Jaguar XJ6 Series III and XJS vehicles, described in a letter mailed to Jaguar owners: "The potential exists for fuel leakage in the engine compartment due to the possibility of deterioration in the integrity of the high pressure fuel hose connections" (R8–47; Pl.Ex. No. 5). At trial, plaintiff Allstate proffered testimony through its expert that the defect identified

in the recall and the defect existing in the subrogors' vehicle were the same, despite the fact that the Hessen's vehicle was not within the specific range of vehicles specified by Jaguar for the recall.[15] Because Allstate met its burden of providing evidence that the defect alleged was the same defect involved in the recall campaign, the trial judge did not abuse his discretion in admitting the recall evidence, and the jury properly could have considered it.[16]

### IV. Other Complaints.

■■■ Jaguar also contends that Allstate was improperly permitted to introduce evidence of other complaints by Jaguar owners. As the district court recognized, because of the potential prejudicial impact of prior occurrences or accidents, such evidence is only admissible if conditions substantially similar to the occurrence caused the prior accidents, and the prior incidents were not too remote in time.

jury consideration under *Cassisi v. Maytag Co.,* 396 So.2d 1140 (Fla. 1st DCA 1981).

**14.** Such a showing is necessary as a matter of relevance. *See, e.g., Calhoun v. Honda Motor Co.,* 738 F.2d 126, 133 (6th Cir.1984) (preliminary requirement for relevancy of recall letter is showing that conditions described in the letter were present when plaintiff had his accident); *Kane v. Ford Motor Co.,* 450 F.2d 315, 316 (3d Cir.1971) (service letter irrelevant where plaintiff presented no testimony that the condition described in the service letter existed on the subject vehicle); *Jordan v. General Motors Corp.,* 624 F.Supp. 72, 77 (E.D.La.1985) (because recall campaign dealt with different model year and because the defect involved in the recall campaign was distinctly different from the defect alleged in instant matter, introduction of recall campaign evidence was irrelevant).

**15.** Jaguar urges that the "defect which was the subject of the recall campaign that was introduced into evidence had nothing to do with the 'connection method' design [ (the defect alleged by Allstate) ], but rather involved a substandard, material used for the fuel hoses on certain vehicles—which vehicles *did not include the vehicle involved in this case.*" Reply Brief of Appellant at 16 (emphasis in original).

It is true that Jaguar apparently made a judgment that the probable cause of the defect, the potential leakage due to deterioration in the fuel hose connection fittings, was a change in the specification of the fuel hose such that fuel contamination of the revised specification hose

outer covering material could result in a degrading of the bond, and thus affect the fuel sealing integrity of the hose and clipping assembly. This *explanation* for the defect, set forth in an information report and technical bulletin sent to Jaguar dealers (*but not* included in the letter sent to Jaguar car owners), (R–Pl.Ex. 5), apparently was the reason that Jaguar chose to recall cars manufactured from April of 1980—a range excluding by a month the date on which the Hessens' vehicle was manufactured.

At trial, however, Allstate's expert disagreed that the defect had to do with material change, testifying that in his opinion, "the defect that was exhibited by the Jaguar XJ6 1980 model year was the same one in the Hessen vehicle and the others that were reported both before the campaign and during the campaign, that was fuel leakage." (R8–51).

**16.** We also note that because the trial judge apparently found the recall evidence to be somewhat prejudicial, but extremely relevant, he admitted it subject to the following jury instruction:

You have heard evidence in this case about a recall campaign. This evidence cannot be considered by you in determining whether or not a defect existed in the vehicle involved in this case. If you find, however, that the plaintiff has demonstrated by a preponderance of the other evidence that a defect existed in his vehicle and that the defect proved as the same which led to the recall, you may consider the recall evidence along with other evidence in determining whether the defect existed in the

*Jones v. Otis Elevator Co.*, 861 F.2d 655, 661–62 (11th Cir.1988); *Borden, Inc. v. Florida East Coast Ry.*, 772 F.2d 750, 755 (11th Cir.1985); *Jones & Laughlin Steel Corp. v. Matherne*, 348 F.2d 394, 400 (5th Cir.1965). Evidence of similar occurrences may be offered to show a defendant's notice of a particular defect or danger, the magnitude of the defect or danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, the strength of a product, the standard of care, and causation. *Borden*, 772 F.2d at 754; *see, e.g., Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 338–39 (5th Cir.1980).

■ Once again, evidence regarding the other complaints was offered by Allstate through the testimony its expert, Julian Nowak. At trial, Nowak testified that he had reviewed information assembled by Jaguar concerning people who had complained about fuel leaks and fuel odors in 1980 Jaguar XJ6 Series III vehicles. Specifically, Nowak reviewed complaints about vehicles manufactured before Jaguar's recall date. (R8–49). Nowak testified further that Jaguar was responding to those prior complaints in the same manner as the recalled vehicles by outfitting them with the new fuel hoses in the "recall kit," even

though the pre-recall cars were out of warranty. (R8–50). Finally, Nowak testified that the defect exhibited in the vehicles manufactured both before and during the recall campaign was the same one existing in the Hessen vehicle—fuel leakage. (R8–51).[17]

Allstate thus introduced evidence involving automobiles identical to the one involved in this case, which were suffering similar problems of fuel odors and leakage. We agree with the district court that the timing and circumstances of the incidents were similar enough that the admission of evidence concerning other occurrences was not an abuse of discretion.

### V. Destruction of Evidence.

■ Jaguar finally laments that Allstate gained an "unfair advantage by destroying critical evidence prior to the inception of this lawsuit." *Initial Brief of Appellant* at 44. Jaguar claims it was prejudiced because the vehicle in question was destroyed before Jaguar could conduct a thorough investigation. Because such "gamesmanship has long been condemned by the courts of this country," Jaguar charges that "it was incumbent upon the court below to take remedial action to pro-

vehicle while it was in the hands of the defendant.
(R9–59–60).

17. Before the evidence was admitted, Nowak testified more extensively outside of the presence of the jury:
Q: First answer my question yes or no. Is the defect [in the Hessen vehicle] the same [as the recall vehicles]?
A: The defect is the same.
Q: Now explain to me the basis for your opinion in that regard?
A: The record of repair complaint indicates that vehicles manufactured in the 1980 model ranging back to VINS starting with the 310, or about 5,000 vehicles ahead of the one where the campaign initiated exhibited leakage through the injector hoses. There were indications of fumes, there were indications of leaks....
Q: Mr. Nowak, I believe you were saying that you had reviewed Jaguar's own material and there were vehicles exhibiting leaks and fumes prior in time to the Hessen vehicle?
A: That's correct.
Q: And also outside the time designated by Jaguar for the recall?

A: That's correct, also.
Q: Tell the Court what those defects or what the complaint information revealed to you?
A: The complaint information indicated that there were substantial problems of leakage and fume complaints from the fuel system, primarily from the hoses.
They also indicated that the same kit that was used for the recall, the A266 kit, was used to repair these vehicles.
They further indicated that Jaguar had received some of these complaints as early as 1981, and there were a number of them. I think the pry—primarily during 1982, whereas this fire was in 1984, two years later.
Q: Let me be very specific.
When you say they had received complaints, that would be on vehicles manufactured during the time of the Hessen vehicle and the complaints were received before the accident in this case?
A: That's correct. The date of manufacture as indicated by the vehicle identification numbers were well before the Hessen vehicle. The complaints were substantially before, two years before the fire occurred.
(R8–8–11) (objection omitted).

tect" Jaguar's interests by either dismissing the action or excluding Allstate's expert testimony. On this record, we think Jaguar's claim is, at best, unconvincing, at worst, frivolous.

Jaguar received notice of the vehicle's explosion within a day of its occurrence, and promptly dispatched a representative to the Hessens' house to inspect the vehicle. Jaguar does not dispute Arnold Hessen's testimony that this representative spent approximately two minutes with the vehicle, nor does Jaguar dispute Hessen's account of the exchange that followed:

I said to him, well, what's the next step? What do you want me to do next?

He says, I don't want you to do anything.

I said, well, how are we going to take care of the car, and what's going to go on with regard to finding out the cause of the fire?

He said, well, the firemen must have looked at the thing and it had a bunch of miles on the car, so we are through with our inspection.

But I said, you didn't do anything on the car. I said, what do you want me to do with the car, where do you want me to put it?

He said, that's not my concern.

(R7–54). Hessen further testified that he then gave the car to a junk yard because his Allstate policy didn't cover storage, and because he knew "Jaguar didn't want to look at it, didn't want the car." (R7–57). Two days later, Hessen received a letter from Jaguar reaffirming the representative's statements, saying that based upon the representative's "investigation," along with the facts that the car was out of warranty, had 59,000 miles on it, and its service record, Jaguar did "not see where we have any responsibility for the cause of the fire. We thank you for the opportunity of doing the inspection and regret to hear of the mishap." (R–Pl.Ex. 4).

In ruling on this issue, the district court observed that "Plaintiffs are not to blame for Defendant's failure to undertake an in-depth examination of the fuel hoses when invited to do so." We agree. The district court did not err in failing to dismiss Allstate's claim or in failing to exclude the testimony of Allstate's expert.

## CONCLUSION

This case was tried, won and lost on the merits. For the reasons set forth above, the rulings of the district court are AFFIRMED on all grounds.