H. David REYNARD, Jr., personal Representative of the Estate of Susan Elen Reynard; Zackary David Reynard, a Minor, By his Next Friend, H. David Reynard, Jr., and H. David Reynard, Jr., Plaintiffs,

v.

NEC CORPORATION; NEC America, Inc.; GTE, Inc.; and GTE Mobilnet of Tampa, Inc., Defendants.

No. 94–825–CIV–T–21E.

United States District Court, M.D. Florida, Tampa Division.

May 17, 1995.

Ernest Paul Jenkins, Jenkins, Walters & Kaiser, P.A., John A. Lloyd, John Lloyd Law Offices, P.A., St. Petersburg, FL, for plain-

tiffs H. David Reynard, Jr. and Zackary David Reynard.

Edward W. Gerecke, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, PA, Tampa, FL, for defendant NEC America, Inc.

James Robert Freeman, Shear, Newman, Hahn & Rosenkranz, P.A., Tampa, FL, Fay Morisseau, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Newport Beach, CA, for defendant GTE Mobilnet of Tampa Inc.

## ORDER

NIMMONS, District Judge.

This cause comes before the Court on several pending motions: (1) Motion of Defendant GTE Mobilnet of Tampa, Inc. to Dismiss Plaintiffs' Complaint Pursuant to Rule 12(b)(6) (Dkt. 7) and Plaintiffs' responses (Dkts. 14 & 17) in opposition thereto; (2) Defendant, GTE Mobilnet of Tampa, Inc.'s Motion to Dismiss Plaintiffs' Complaint Against Defendant, GTE, Inc. (Dkt. 18); (3) Defendant, NEC America, Inc.'s Dispositive Motion for Summary Judgment (Dkt. 25) and Plaintiffs' response (Dkt. 42) in opposition thereto; (4) GTE Mobilnet's Motion for Summary Judgment (Dkt. 36) and Plaintiffs' response (Dkt. 42) in opposition thereto; (5) Plaintiffs' Motion that Discovery Be Extended, That Case Be Designated Track Three Case (Dkt. 39) and Defendant NEC America's response (Dkt. 52) in opposition thereto;[1] (6) Plaintiffs' Motion for Relief Under Fed.Civ.R.P. 56 (Dkt. 41) and Defendant, NEC America, Inc.'s response (Dkt. 52) in opposition thereto; (7) Allied National, Inc., f/k/a Heart of America Trust Employers Group Insurance's Motion to Intervene (Dkt. 67) and Defendant NEC America, Inc.'s response (Dkt. 70) thereto.

### I. Defendants' Motions for Summary Judgment

#### A. Summary Judgment Standard

The Court will enter summary judgment only if the evidence shows "that there is no

1. On May 4, 1995, the Court granted the Plaintiffs' Motion for Extension of Time to File Memorandum (Dkt. 76), thereby giving the Plaintiffs to and including May 15, 1995 within which to file their memorandum responding to the supple-mental memorandum submitted by GTE Mobilnet of Tampa. The Plaintiffs, however, have failed to file their memorandum within the allowed time.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On the issue of materiality, "the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those over which disputes "might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. at 2510.

The movant bears the burden of establishing the absence of dispute over material facts. *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993). Where, as here, the party opposing the summary judgment motion has the burden of proof at trial, the moving party must either point out to the Court specific portions of the record which show that the nonmoving party cannot prevail at trial, or introduce affirmative evidence negating the opposing party's case. *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir. 1991). In determining whether the party seeking summary judgment has met its initial burden, the Court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606 (11th Cir.1991). Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment. *Reynolds,* 989 F.2d at 469. If the moving party does not meet its burden, the motion for summary judgment will be denied. *Four Parcels of Real Property,* 941 F.2d at 1437. Where the moving party meets its initial burden, the burden shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark,* 929 F.2d at 608.

### B. *Discussion*

The Plaintiffs' Complaint (Dkt. 1) alleges that Susan Elen Reynard had used a cellular telephone sold by Defendant NEC America, Inc. and that Defendant GTE Mobilnet of Tampa, Inc. "engaged in the operation of the microwave system required to be used with the cellular telephone." They allege that the cellular telephone was defective and negli-

gently designed, and that electromagnetic radiation (EMR) from the phone initiated or accelerated the growth of a tumor in her brain, which eventually led to her death. The Plaintiffs sue under the wrongful death statute, §§ 768.16—768.27, Florida Statutes, alleging that Susan Reynard's portable cellular telephone initiated the brain tumor. Alternatively, the Plaintiffs sue on the theory that the cellular phone accelerated and aggravated the course of an already existing tumor.

Defendant NEC America, Inc. and Defendant GTE Mobilnet of Tampa, Inc. move for summary judgment on the issue of causation. The Defendant NEC America Inc. and Defendant GTE Mobilnet of Tampa, Inc. submit the affidavits of Dr. F. Kristian Storm III, M.D. (Dkt. 28) and Dr. Carl Hudson Sutton, M.D. (Dkt. 36, Exh. 4), respectively, to demonstrate the absence of medical causation in this case, and to shift the burden of presenting admissible expert testimony on medical causation to the Plaintiffs.

Dr. Storm's affidavit states that he is past chairman of the American National Standards Institute subcommittee that drafted the U.S. safety standard for exposure to EMR. The affidavit also states that Dr. Storm was familiar with or familiarized himself with the relevant medical and scientific literature, Susan Reynard's medical records, the MRI films of the brain taken in 1989 and 1990, and relevant deposition transcripts. Dr. Storm concludes in his affidavit that:

No scientific or medical studies have shown that exposure to emissions deposited at the brain from a source such as a portable cellular telephone operating at the power level and frequency of the portable cellular phone alleged to have been used [by] Susan Reynard is associated with any adverse biological effects, including initiation of brain cancer or promotion of brain cancer growth....

[E]pidemiology reports establish that the overall incidence of brain cancer has remained fairly constant over time and their location in the brain [has remained] random, evidencing the lack of any association [with the use of portable cellular telephones] ...

Based upon my review of [various relevant] materials, as well as my extensive education, training and experience in electromagnetics and as a physician who specializes in cancer treatment, it is my opinion, within reasonable medical probability, that Susan Reynard's use of a portable cellular telephone did not cause or contribute to the initiation or promotion of growth of Susan Reynard's brain tumor ...

Nothing in her medical or clinical course distinguishes her in any fashion from the thousands of patients that I have either treated with cancer or that have reported with this form of brain tumor who have not used portable cellular telephones.

The affidavit submitted by Dr. Sutton sets forth his impressive credentials indicating that he has extensive experience in researching and treating brain cancer, including, significantly, research and publications on the effects of microwave energy on brain tumors. Further, Dr. Sutton has been a member and served on radio frequency and microwave standards-setting committees from 1978 to the present time. The affidavit also states that Dr. Sutton has reviewed the medical records of Susan Reynard, which he states are the type of records customarily and reasonably relied upon by experts such as himself to form medical opinions. Dr. Sutton's affidavit further states:

My opinion within a reasonable medical probability that Susan Reynard's brain tumor was not initiated or promoted by the use of the cellular telephone is based in part on the following:

a. Susan Reynard started using the cellular telephone on about August 1988. Her first MRI was taken in March 1989 and it showed in my opinion what appears to have been a brain tumor.

A subsequent MRI in May 1990 showed growth in her brain tumor. From examining the MRIs of March 1989 and May 1990, it is my opinion within a reasonable medical probability that she had the brain tumor before she ever used the cellular telephone. Thus, the cellular telephone could not have initiated or caused the brain tumor.

b. Susan Reynard's brain tumor was diagnosed as a Grade III Astrocytoma. It was located in the left parieto-occipital region of her brain. Neither the type nor location of her brain tumor is unusual. Further, Susan Reynard lived for approximately two years following her brain surgery. She received cancer treatment for her cancer after her surgery. Her survival time is within the normal range for the type of cancer she had and for the type of treatment she received. Therefore, there is nothing in the type, location, or survival time for her cancer which in my opinion, within a reasonable medical probability, would show that her cancer was promoted by the use of the cellular telephone.

Further, both Defendants assert that the deposition testimony of the Plaintiffs' experts in the state court action [2] does not establish medical causation, and that, based on that testimony, the Plaintiffs cannot meet their burden under *Daubert*.[3] First, they point out that Dr. Jan Leestma, a neuropathologist who examined Susan Reynard's brain after her death, testified that he could not determine from the materials, information, and knowledge he had and could not assign a probability as to whether exposure to EMR from a cellular phone caused or contributed

**2.** GTE Mobilnet's memorandum (Dkt. 8) in support of the motion to dismiss indicates that Susan Elen Reynard and H. David Reynard, Jr., her husband, originally filed a Complaint in the Circuit Court for Pinellas County, Florida, Case No. 92–1750–CI–011, against NEC America, Inc., Roastal Radiotelephone, Inc. and GTE Mobilnet of Tampa, Inc. On November 2, 1993, the Plaintiff, H. David Reynard, Jr., then Personal Representative of the Estate of Susan Elen Reynard, entered into a Stipulation with GTE Mobilnet of Tampa, Inc. dismissing the action against them,

and an Order was entered on November 9, 1993 dismissing the action without prejudice. The action remained pending against NEC America, Inc. until May 19, 1994 when the State Court action was voluntarily dismissed by Plaintiff.

**3.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *and on remand,* 43 F.3d 1311 (9th Cir. 1995).

to the growth of Susan Reynard's tumor. (Dkt. 30 at 74, 82–83).

Second, the Defendants assert that Plaintiffs' other expert, Dr. John Holt, has expressed no opinion supporting the Plaintiffs within reasonable medical probability. The Defendants assert that Dr. Holt's testimony was unorthodox and state that Dr. Holt himself admits that his theories are not accepted by the medical and scientific community and that no clinical study has ever been done to test his theories. Further, Defendants assert that even if Dr. Holt is to be believed, the application of his theories in the instant case is worse than speculation, because such application is not even supported by his own observations. They explain that Dr. Holt has observed and believes that human cancer cells, exposed to 434 MHz EMR at high power, died, and those exposed to MHz EMR at low power exhibited a phenomenon he describes as fluorescence. They assert that Dr. Holt alone believes that this phenomenon is related to the increased growth rate of cancer exposed to radiation at the low power frequency of 434 MHz. With regard to the fact that Susan Reynard's phone operated not at 434 MHz, but between 825 and 845 MHz, Defendants point out that Dr. Holt stated that "I don't know the answer" as to the effects of the cellular phone's frequency and that he would not "hazard a guess" because "everything is so individual in the cancer field." (Dkt. 31 at 186). Further, Dr. Holt stated that he could not quantify how much of the growth rate of her tumor might be related to EMR, "[b]ecause one doesn't know what the cancer was like and her clinical progression rate was like before she was exposed to her hand-held phone," and he therefore agreed that there was no way to determine whether her outcome would have been different had she not been exposed to stray electromagnetic radiation. (Dkt. 31 at 20–21).

In response, the Plaintiffs submit an expert affidavit of Dr. David Perlmutter, M.D. (Dkt. 44) disputing the contentions of Dr. Storm and Dr. Sutton. The Plaintiffs also assert that the Defendants have attempted to ridicule Dr. Holt "by selective out-of-context excerpts from his deposition." Further, the Plaintiffs have submitted a medical journal article (Dkt. 42, Exh. 13) concerning Dr. Holt that was written by a professor, Dr. William L. Caldwell, M.D., from the University of Wisconsin. The Plaintiffs point out that Dr. Caldwell's article suggests that Dr. Holt's therapy has been effective and that phase II trials utilizing 434 MHz radiations in conjunction with ionizing radiations have been initiated at the Indiana University School of Medicine and the Wisconsin Center for Health Sciences. The Plaintiffs have also attached as "Exhibit A" a copy of an article from a publication entitled "Microwave News" that they assert suggests that cellular phone emissions can "act as a cancer-causing agent." Finally, the Plaintiffs have also submitted two affidavits, those of: (1) Plaintiff H. David Reynard, Jr. (Dkt. 45), and (2) the Plaintiffs' attorney, John A. Lloyd, Jr. (Dkt. 46), as well as one other document, the United States General Accounting Office (GAO) Report to the Chairman, Subcommittee on Telecommunications and Finance Committee on Energy and Commerce, House of Representatives (Dkt. 43). The Plaintiffs have not responded to the Defendants' arguments regarding Dr. Leestma or Dr. Holt.

In evaluating the Plaintiffs' response to the motions for summary judgment, the Court first notes that in light of the evidence set forth by the Defendants, the burden is on the Plaintiffs to come forward with admissible evidence on the issue of medical causation in order to demonstrate that there is a material issue of fact that should preclude summary judgment. *Clark*, 929 F.2d at 608. Further, under Florida law, the plaintiff in general, of course, bears the burden of proving causation. *See e.g., Reaves v. Armstrong World Industries, Inc.*, 569 So.2d 1307, 1309 (4th DCA 1990). The plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough." *Reaves*, 569 So.2d at 1309, *quoting Gooding v. University Hospital*, 445 So.2d 1015 (Fla.1984). *See also Hessen v. Jaguar Cars, Inc.*, 915 F.2d 641, 647 (11th Cir.1990) ("Florida has adopted a preponderance standard for causa-

tion in both negligence and strict liability actions; a mere possibility of causation is not enough.").

■ With regard to the medical journal article (Dkt. 42, Exh. 13) concerning Dr. Holt by a professor, Dr. William L. Caldwell, M.D., and the article from a publication entitled "Microwave News" (Dkt. 42, Exh. A), the Court finds that they do not satisfy the Plaintiffs' burden of demonstrating a material issue of fact regarding causation in the instant case. First, the Plaintiffs have not discussed the manner in which the statements or conclusions of these articles support their case. Rather, the articles themselves suggest that the Plaintiffs' position is not generally accepted. Dr. Caldwell's article states, "A number of ill-conceived speculations and poorly-based claims included in [Dr. Holt's thesis, 'Cure of Cancer—A Preliminary Hypothesis'] were harmful to his image and subsequently have interfered with his being accepted *now* after he has accrued an exceptional clinical experience in more than 1,500 patients and has moderated his claims." Although Dr. Caldwell's article indicates that phase II trials utilizing 434 MHz radiations in conjunction with ionizing radiations have been initiated, the Plaintiffs have not shown, and the article does not suggest, how such theory applies to cellular telephone emissions. Additionally, the article in "Microwave News" contains numerous statements indicating that the hypothesis that microwaves could act as a cancer-causing agent is uncertain. For example, Dr. Lai, one of the researchers, states in the article, "We have a long way to go before we can reach any definitive conclusions."

■ Further, the Court finds that the only medical evidence on causation submitted by the Plaintiffs is the affidavit of Dr. Perlmutter, which the Court finds does not establish a material issue of fact. Dr. Perlmutter's affidavit points out that the November 1994 report of the General Accounting Office is a call for research because the research findings on exposure to low level radio-frequency radiation are inconclusive. Dr. Perlmutter further indicates that he is in complete agreement with Dr. Storm's finding that Susan Reynard's tumor began many years be-

fore she began using a cellular telephone in 1988. Dr. Perlmutter also states in his affidavit that he agrees with the affidavit of Dr. Storm in its finding that "No scientific or medical studies have shown that exposure to emissions deposited at the brain from a source such as a portable cellular telephone operating at a power level and frequency of the portable cellular phone alleged to have been used (by) Susan Reynard is associated with any adverse biological effects, including initiation of brain cancer or promotion of brain cancer growth." Dr. Perlmutter states, however, that:

> [I]t is certainly quite evident that both [ ] animal studies and human brain tumor cell studies ... provide strong inferential data that the use of this device represents a clear health hazard and would likely accelerate the growth of brain tumors in humans.
>
> It is my opinion, within a reasonable degree of medical certainty, that the use of the hand-held cellular telephone did in fact accelerate the growth of Susan Reynard's brain tumor.

Additionally, Dr. Perlmutter disagrees with several statements in Dr. Storm's affidavit. Dr. Perlmutter states that some patients with Grade III astrocytomas like Susan Reynard live substantially longer than two years and that some have even been cured of their disease, and he therefore believes that the suggestion that her two year survival after surgery was expected is inappropriate. Further, he states that brain tumors of the type at issue in this case "are clearly on the increase as described in a recent article appearing in the *New England Journal of Medicine.*"

■ The Court first finds that there is no genuine issue of material fact with regard to the Plaintiffs' wrongful death claim, and that the Defendants are therefore entitled to judgment as a matter of law on that claim. In an action for wrongful death, Florida law applies traditional causation principles, which require proof under the but-for test. *Tappan v. Florida Medical Center, Inc.,* 488 So.2d 630, 631 (Fla. 4th DCA 1986). The testimony of Dr. Perlmutter indicates that

the Plaintiffs' wrongful death action fails the but-for test due to his statement that he is in complete agreement with Dr. Storm that Susan Reynard's tumor began many years before she began using a cellular telephone. Further, the Plaintiffs have not presented any evidence suggesting that but for her use of the cellular telephone, it was more likely than not that she would have survived.

Secondly, the Court finds that Dr. Perlmutter's affidavit does not create a genuine issue of material fact with regard to the claim that the cellular telephone accelerated Susan Reynard's brain tumor. It is well established that "a party may not avoid summary judgment on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations." *Evers v. General Motors Corp.*, 770 F.2d 984, 985 (11th Cir.1985). Further, in a wrongful death action based upon allegations of negligence and strict liability:

> While the expert may base his opinion on facts or data reasonably relied upon by experts in the field, and this data need not be admissible in evidence, Fed.R.Evid. 703, an expert's affidavit must nevertheless set forth specific facts in order to create an issue of fact for trial. 'Theoretical speculations, unsupported assumptions, and conclusory allegations advanced by an expert ... are [not] entitled to any weight when raised in opposition to a motion for summary judgment.'... [W]hen causation is the issue, 'courts are particularly wary of unfounded expert opinion.' ... 'The uncertainty of the evidence in [toxic tort] cases, dependent as it is upon speculative scientific hypotheses and epidemiological studies, creates a special need for robust screening of experts and gatekeeping under Rules 403 and 703 by the court.'

*Bell v. Swift Adhesives, Inc.*, 804 F.Supp. 1577, 1579 (S.D.Ga.1992) (citations omitted).

■ Further, Florida courts hold that the party opposing summary judgment must present nonspeculative evidence as to what extent, if any, the defendant's actions decreased life expectancy. *See e.g., Noor v. Continental Casualty Co.*, 508 So.2d 363, 365 (Fla. 1st DCA 1987). In *Noor*, for example, the plaintiff was unable to present any non-speculative evidence regarding the extent to which the doctor's failure to immediately diagnose her disease added to plaintiff's decreased life expectancy. *Id.* at 365. The court therefore held that the defendants were properly awarded summary judgment as a matter of law. *Id.*

■ Additionally, under Florida law, the proffered evidence on causation must meet the more likely than not standard. This standard may be met, for example, by evidence establishing that the patient "would have survived" with prompt diagnosis and surgery. *Gooding v. University Hosp. Bldg. Inc.*, 445 So.2d 1015, 1019 (Fla.1984), *citing Hicks v. United States*, 368 F.2d 626, 632 (4th Cir.1966). This standard may also be satisfied with expert testimony that the patient had, for example, a seventy five percent chance of recovery with prompt treatment. *Gooding*, 445 So.2d at 1019, *citing Hamil v. Bashline*, 392 A.2d 1280, 1288 (1978). The Florida Supreme Court itself held that a plaintiff fails to meet the more likely than not standard by not presenting evidence of a greater than even chance of survival for the patient in the absence of negligence. *Gooding*, 445 So.2d at 1020.

In the instant case, Dr. Perlmutter's affidavit does not demonstrate that Susan Reynard's use of the cellular telephone more likely than not accelerated the growth of her brain tumor and shortened her life. Dr. Perlmutter, however, states at the conclusion of his affidavit that "the use of the NEC hand-held cellular telephone by Susan Reynard accelerated the growth of her tumor and, therefore, was in part responsible for her early demise." Dr. Perlmutter makes no attempt to quantify the extent to which the use of the cellular telephone was responsible for her early demise. Further, he does not indicate the specific facts of Susan Reynard's case upon which he bases his conclusion. Although he states that he reviewed the affidavit from Dr. Storm, he does not indicate that he had examined Susan Reynard or reviewed her records. Dr. Perlmutter quotes the recent GEO report and thereby admits that, "No research has been completed on long term human exposure to low levels of radiation specifically from portable

cellular telephones. Research findings on exposure to other sources of low level radio-frequency are inconclusive." Rather, Dr. Perlmutter states that animal studies and human brain tumor cell studies provide "strong inferential data" that the use of a cellular telephone is a health hazard and would likely accelerate the growth of brain tumors in humans. Although he states that such studies are "peer reviewed," he neither provides a copy of the studies nor comments on their acceptance in the scientific and medical community.[4] Additionally, although Dr. Perlmutter states that it was inappropriate to suggest that Susan Reynard was expected to survive two years after her surgery, he does not provide specific facts upon which he could have concluded that *Susan Reynard* should have survived longer. Thus, neither Dr. Perlmutter's conclusions nor the studies from which he gathers "inferential data" are supported by specific facts in the record, and therefore, under Florida law they are not entitled to any weight.

■ Additionally, the Court finds that Dr. Perlmutter's affidavit does not satisfy the admissibility criteria under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Supreme Court held that " 'general acceptance' is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at ——, 113 S.Ct. at 2799. Scientific knowledge that will assist the trier of fact in understanding or determining a fact in issue will satisfy those demands. *Id.* The Supreme Court further stated that although it was not setting out a definitive checklist or test, the following questions were appropriate: (1) whether the theory or technique has been or can be test-

ed; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error in the technique; and (4) whether the theory or technique is generally accepted in the scientific community. *Id.* at ——, 113 S.Ct. at 2797.

The Ninth Circuit Court of Appeals recently rendered its decision on remand in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.1995), interpreting the Supreme Court's ruling in *Daubert*. The Court first noted that in performing their "gatekeeping role," judges:

must satisfy themselves that scientific evidence meets a certain standard of reliability before it is admitted. This means that the expert's bald assurance of validity is not enough. Rather the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology.

*Id.* at 1316. Further, the Court considered three significant factors for determining whether the expert's testimony is admissible. The first consideration "is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Id.* Second, if the expert is not testifying based upon research independent of the litigation, "the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.' " *Id.* at 1318. One means of showing this, as suggested by the Court, "is by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Id.* A third consideration, where there is no

---

4. In connection with its Memorandum in Opposition to Plaintiffs' Motion for Relief Under Rule 56(f), Defendant NEC America, Inc. has filed copies of the studies (Dkt. 53) referred to in Dr. Perlmutter's affidavit. The Court notes that neither study concludes that use of a cellular telephone can accelerate the growth of brain tumors in humans. Further, as Defendant NEC Amer-

ica, Inc. points out, both studies were listed and relied upon by the GEO in its report, which Dr. Perlmutter quotes as stating, "No research has been completed on long-term human exposure to low levels of radiation specifically from portable cellular telephones. Research findings on exposure to other sources of low level radio-frequency radiation are inconclusive."

evidence that the expert's proffered testimony grows out of research conducted independent of litigation, or that the expert's research has been subjected to peer review, is testimony of other experts. *Id.* The Court explained that for such other expert testimony to be sufficient:

[T]he experts must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field.

*Id.*

Applying the Supreme Court's analysis of *Daubert* and the Ninth Circuit's interpretation to the instant case, the Court finds that Dr. Perlmutter's affidavit is not admissible. The affidavit contains no reference to any scientific or medical research by Dr. Perlmutter independent of this litigation or any indication that he examined Susan Reynard or reviewed her medical records. Dr. Perlmutter also makes no reference to any independent research regarding the use of the type of cellular telephone that Susan Reynard used or the use of any cellular telephone, or research regarding the type of radiation to which she was allegedly exposed. Further, as mentioned above, there is no proffered evidence that the studies, analysis, and conclusions of Dr. Perlmutter's affidavit have been subjected to the normal scientific scrutiny through peer review and publication. Additionally, the conclusions of the affidavit are not supported by any objective source, such as a treatise or a published article in a reputable scientific journal.

## II. Plaintiffs' Request for Continuance Under Rule 56(f), Fed.R.Civ.P.

■ On December 20, 1994, the Plaintiffs filed a motion requesting that Defendants' motions for summary judgment "be refused and deferred until discovery is completed." In support of their motion, they filed the three affidavits referred to above.

In *Securities and Exchange Comm'n v. Spence & Green Chemical Co.*, 612 F.2d 896 (5th Cir.1980), the Court stated:

Because the burden on a party resisting summary judgment is not a heavy one, one must conclusively justify his entitlement to the shelter of rule 56(f) by presenting specific facts explaining the inability to make a substantive response as required by rule 56(e) and by specifically demonstrating 'how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.' The nonmovant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts, particularly where, as here, ample time and opportunities for discovery have already lapsed.

*Id.* at 901 (citations omitted). Further, this Court has stated that "[t]he party opposing the motion for summary judgment by Rule 56(f) . . . may not simply rely on vague assertions that additional discovery will produce needed but unspecified facts, but must indicate how the stay will permit it, through discovery, to rebut the movant's contentions." *Williams v. Orange County*, 783 F.Supp. 1348, 1352 (M.D.Fla.1992), *citing Barfield v. Brierton*, 883 F.2d 923, 931 (11th Cir.1989). Additionally, the movant's affidavit must explain "what effort the affiant has made to obtain" the facts sought through discovery and "why the affiant was unsuccessful in those efforts." *Hickman v. Wal-Mart Stores, Inc.*, 152 F.R.D. 216, 221 (M.D.Fla.1993).

The Court finds that the affidavits submitted by Plaintiffs do not justify deferring rulings on the motions for summary judgment. The affidavits do not indicate how a deferral will permit the Plaintiffs to rebut the motions, or what efforts are being made to obtain new evidence. Further, in the more than four months since filing the motion for continuance, the Plaintiffs have not filed herein any notice as to whether discovery is continuing, whether evidence has been found, or any explanation as to why discovery has been unsuccessful.

### III. *Motion to Intervene*

Allied National, Inc., f/k/a Heart of America Trust Employers Group Insurance moves, pursuant to Rule 24, Fed.R.Civ.P., to intervene in this cause. In support of its motion, Allied National states that it has paid to or for the benefit of the Decedent, Susan Reynard, and/or her Estate, medical bills totally approximately $93,842.55. As such, Allied National claims an interest relating to the transactions that were the subject matter of this action, and states that it is situated such that the disposition of this action may, as a practical matter, impair or impede its ability to protect its subrogation interests. Allied National further states that its interest is not currently represented by the existing parties in this action. Finally, Allied National states that its claim and the main action have questions of law and fact in common. Allied National has submitted a proffered Cross–Claim containing one count for equitable subrogation.

In response to the motion to intervene, Defendant NEC America, Inc. has stated that, while denying any obligation to Allied, Defendant does not object to the motion to intervene. The Plaintiffs have not filed a response to the motion to intervene. In light of the Court's ruling on the other pending motions in this case, however, the Court finds that it need not address the merits of Allied National's motion to intervene. The Court will, therefore, deny the motion without prejudice.

### IV. *Motion to Dismiss*

Defendant GTE Mobilnet of Tampa, Inc. moves to dismiss the Plaintiffs' Complaint against GTE Corporation[5] and as grounds therefor, states that Plaintiffs have failed to effect service of the Summons and Complaint upon GTE Corporation within 120 days as provided under Rule 4(m), Fed.R.Civ.P. The Plaintiffs have not responded to the motion to dismiss or provided any explanation of good cause for the failure to effect timely service of process. Accordingly, the motion to dismiss will be granted.

---

5. Although the motion refers to GTE, Inc., it concerns GTE Corporation. On April 26, 1995, the Court entered an Order (Dkt. 73) directing

Upon consideration of the foregoing, it is hereby **ORDERED and ADJUDGED** that:

(1) Defendant, NEC America, Inc.'s Dispositive Motion for Summary Judgment (Dkt. 25) is **GRANTED.**

(2) GTE Mobilnet's Motion for Summary Judgment (Dkt. 36) is **GRANTED.**

(3) Plaintiffs' Motion for Relief Under Fed.Civ.R.P. 56 (Dkt. 41) is **DENIED.**

(4) Allied National, Inc., f/k/a Heart of America Trust Employers Group Insurance's Motion to Intervene (Dkt. 67) is **DENIED without prejudice.**

(5) Defendant, GTE Mobilnet of Tampa, Inc.'s Motion to Dismiss Plaintiffs' Complaint Against Defendant, GTE, Inc. [GTE Corporation] (Dkt. 18) is **GRANTED.**

(6) Plaintiffs' Motion that Discovery Be Extended, That Case Be Designated Track Three Case (Dkt. 39) is **DENIED.**

(7) Motion of Defendant GTE Mobilnet of Tampa, Inc. to Dismiss Plaintiffs' Complaint Pursuant to Rule 12(b)(6) (Dkt. 7) is **DENIED as moot.**

(8) The Clerk is **DIRECTED** to enter judgment for the Defendants.

**DONE AND ORDERED.**

---

the clerk to correct the docket in this case to reflect the Defendant GTE, Inc.'s name change to GTE Corporation.