931 F.2d 816
 1991-1 Trade Cases 69,440, 33 Fed. R. Evid. Serv. 413
 T. HARRIS YOUNG & ASSOCIATES, INC., a Florida corporation,
Plaintiff-Counter Defendant-Appellant/Cross-Appellee,
v.
MARQUETTE ELECTRONICS, INC., a Wisconsin corporation,
Defendant-Counterclaim - Appellee/Cross - Appellant.
T. HARRIS YOUNG & ASSOCIATES, INC., a Florida corporation,
Plaintiff-Appellant, Cross-Appellee,
v.
MARQUETTE ELECTRONICS, INC., a Wisconsin corporation,
Defendant-Appellee, Cross-Appellant.
 Nos. 90-3252, 90-3364.
 United States Court of Appeals,
Eleventh Circuit.
 May 20, 1991.
 
 Eli H. Subin, John M. Brennan, Subin, Shams, Rosenbluth & Moran, P.A., Orlando, Fla., for T. Harris Young & Associates, Inc.
 Paul E. Slater, Christopher J. Murdoch, Sperling, Slater & Spitz, Melvin S. Newman, Schoenberg, Fisher & Newman, Ltd., Mark P. Cohen, Schoenberg, Fisher & Newman, Ltd., Chicago, Ill., for Marquette Electronics, Inc. in 90-3252 and 90-3364.
 Davisson F. Dunlap, William D. Palmer, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Orlando, Fla., for Marquette Electronics, Inc. in 90-3364.
 Appeals from the United States District Court for the Middle District of Florida.
 Before HATCHETT and DUBINA, Circuit Judges, and HILL, Senior Circuit Judge.
 HILL, Senior Circuit Judge.
 
 
 1
 This appeal concerns an antitrust and tortious interference with business action. Plaintiff T. Harris Young & Associates, Inc. ("THY") sued defendant Marquette Electronics, Inc. ("Marquette"), alleging an illegal tying arrangement, attempted monopolization, and tortious interference with business because of certain alleged false claims. The jury returned a verdict in favor of THY on all three claims. The district court granted a judgment notwithstanding the verdict on the two antitrust claims. Plaintiff appeals this grant, while defendant appeals the failure to grant such a judgment on the tort claim.[1] We affirm the judgment notwithstanding the verdict on the antitrust claims and reverse the denial of a judgment notwithstanding the verdict on the tort claim.
 
 I. BACKGROUND
 A. Factual History
 
 2
 Marquette, a Wisconsin corporation, manufactures electrocardiograph ("EKG") and stress testing machines for sale to medical clinics, doctors' offices, and hospitals. There are approximately nine manufacturers of EKG machines in the United States, and eighteen of stress testing equipment. The equipment utilizes heat sensitive recording paper that displays a graphic line when moved across a heated printhead. Marquette also sells this paper for use in its machines.
 
 
 3
 THY distributes Marquette recording paper in the southeastern United States, an area including Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and portions of Virginia and Tennessee. THY has no written distribution agreement with Marquette, and the relationship is terminable at will. Despite the instant lawsuit, the relationship continues to this day.[2] Until 1987, THY was the only seller of Marquette paper in the southeast. In 1986, Marquette informed THY of its intention to reduce the discount on supplies it sold THY at wholesale, and THY informed Marquette of its intention to add a competitive generic paper line (Clinical Health Products ("CHP") paper). Marquette then began directly selling its paper in the southeast in 1987.[3]
 
 
 4
 THY attempted to establish at trial, and argues on appeal, that in attempting to sell its own paper Marquette told customers that non-Marquette paper would damage their machines and that the Marquette equipment warranties would be void if the customers used non-Marquette paper. On appeal, Marquette denies its employees made such statements, but admits they told customers that if defective non-Marquette paper damaged a Marquette machine, Marquette would not repair it for free.[4] No evidence was presented at trial that Marquette ever voided a warranty or service contract.
 
 
 5
 At trial, THY sought to define the relevant market for paper customers. THY defined the geographic market for paper as the aforementioned nine-state area comprising Young's sales territory as a Marquette distributor. The evidence adduced at trial was that paper prices inside and outside this territory were virtually the same.[5] Furthermore, all suppliers relied on UPS or a similar common carrier for delivery, and while the delivery costs for outside sellers varied from 36.1% higher to 11.7% higher, delivery costs as a percentage of the total cost of the paper were very small.[6] Of the 13 companies supplying Marquette or Marquette-compatible paper to customers in the nine-state area, six were from outside the area, and three of those six sold Marquette brand paper.[7] Young testified, however, that a customer preference for regional service existed because of the need for emergency deliveries and because the end user pays for transportation costs.
 
 
 6
 THY defined the product market for paper as hospitals with 200 or more beds, despite the sale of identical products to smaller customers. The evidence at trial indicated that the 200+ beds customers accounted for approximately 80% of both plaintiff's and defendant's sales, and that in general approximately 80% of the purchases by hospitals are made by those customers.
 
 B. Procedural History
 
 7
 Young brought suit against Marquette, alleging a tying arrangement in violation of Section 1 of the Sherman Act, attempted monopolization in violation of Section 2 of the Sherman Act, and tortious interference with business.[8] The jury found for Young on all three counts. Using a special verdict form, the jury specifically found that the relevant market for EKG recording paper consisted of hospitals of 200+ beds in the southeastern area of the United States consisting of Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and portions of Virginia and Tennessee. The jury awarded $1.4 million on the tying claim, $1.8 million on the monopoly claim, and over $3 million on the tort claim ($1.25 million compensatory damages plus $1.8 million punitive damages).[9]
 
 
 8
 Marquette moved for a judgment notwithstanding the verdict and for a new trial on all three counts. The district court gave two reasons for granting the motion on the tying claim: first, THY failed to define the relevant market for the tying product (EKG and stress testing machines); and second, a product market for paper of hospitals with 200+ beds was insufficient as a matter of law. The court granted Marquette's motion on the attempted monopoly claim also because it found the product market to be insufficient as a matter of law. The district court did not grant Marquette's alternative motions for new trial on these two counts.
 
 
 9
 Regarding the Florida common law tort count, the district court found that there was ample evidence from which the jury could have concluded that Marquette tortiously interfered with THY's business, and that the interference was intentional and had the destruction of THY's business as its purpose. Accordingly, the district court denied Marquette's motions for JNOV and new trial on this count.
 
 II. STANDARD OF REVIEW
 
 10
 A motion for a JNOV tests the sufficiency of evidence supporting a jury verdict. Hessen v. Jaguar Cars, Inc., 915 F.2d 641, 644 (11th Cir.1990). Because sufficiency of the evidence is a question of law subject to de novo review, we review the district court's grant or denial of a JNOV under the same standard as the district court applied. Id.
 
 
 11
 All of the evidence presented at trial must be considered "in the light and with all reasonable inferences most favorable to the party opposed to the motion." A motion for judgment n.o.v. should be granted only where "reasonable [people] could not arrive at a contrary verdict...." Where substantial conflicting evidence is presented such that reasonable people "in the exercise of impartial judgment might reach different conclusion, [sic]" the motion should be denied.
 
 
 12
 Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1558 (11th Cir.1988) (citations omitted).
 
 
 13
 The district court's evidentiary rulings are discretionary, and we will not disturb them absent a clear showing of an abuse of discretion. Hessen, 915 F.2d at 644.
 
 III. DISCUSSION
 A. The Antitrust Claims
 
 14
 1. The Tying Claim: Where there is no Tie, there is no Claim
 
 
 15
 As an initial matter, defendant argues that plaintiff failed to prove that a tying arrangement existed at all. Defendant contends that, for a tying arrangement to exist, a seller must condition the sale of the tying product on the purchase of the tied product. As plaintiff states in its briefs, the tying product in this case would be "electronic medical equipment," and the tied product would be "electrocardiographic recording paper." Defendant argues that it did not condition the sale of equipment on the purchase of paper, and thus no tie existed. Plaintiff, by contrast, maintains that it must show only coercion by the seller that forced the buyer to purchase the tied product, and that the coercion need not consist of the withholding of the tying product. In other words, plaintiff maintains that if it shows such coercion, then it has shown a tie and that tie is illegal.
 
 
 16
 This view is not correct. This circuit has clearly stated that "a tying arrangement is 'an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product.' " Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486, 1502 (11th Cir.1985) (emphasis added) (quoting Northern Pacific Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)), cert. denied, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986). See also Tic-X-Press, Inc. v. Omni Promotions Co., 815 F.2d 1407, 1414 (11th Cir.1987); Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 711 (11th Cir.1984); Kypta v. McDonald's Corp., 671 F.2d 1282, 1284 (11th Cir.), cert. denied, 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 109 (1982). In other words, for a tie to exist a seller must withhold product A unless the buyer also selects product B.[10] Only after the existence of a tie is shown is it necessary to determine whether an illegal tying arrangement exists.[11] A tying arrangement will be per se illegal if: (1) the seller possesses sufficient economic power in the tying product market to force the buyer to accept the tied product;[12] and (2) a "not insubstantial" amount of interstate commerce in the market of the tied product is involved. Tic-X-Press, 815 F.2d at 1414.[13]
 
 
 17
 Affirmance of a JNOV is proper even if based on a rationale different from that of the district court. Wilson v. Bicycle South, Inc., 915 F.2d 1503, 1506 (11th Cir.1990). THY does not even allege that Marquette withheld or threatened to withhold electronic medical equipment unless its customers selected Marquette electrocardiographic recording paper. Because THY has presented no evidence that a tie exists, we affirm the grant of JNOV on the tying claim.
 
 
 18
 2. The Monopoly Claim: Where there is no Market, there is no Monopoly
 
 
 19
 The offense of monopolization under section 2 of the Sherman Act[14] contains two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). The offense of attempted monopolization requires specific intent on the defendant's part to bring about a monopoly and a dangerous probability of success. Quality Foods v. Latin Am. Agribusiness Dev. Corp., 711 F.2d 989, 996 (11th Cir.1983). Furthermore, like the monopolization offense itself, the attempt must happen in a defined relevant market. Id. The relevant market is defined by both a product and a geographic dimension. Spectrofuge Corp. v. Beckman Instruments, Inc., 575 F.2d 256, 276 (5th Cir.1978), cert. denied, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); Heatransfer, 553 F.2d at 980.
 
 
 20
 It is the analysis of the relevant market for electrocardiographic recording paper that is dispositive of the monopoly claim in the case before us. The district court denied Marquette's motion for JNOV based on the insufficiency of the geographic market, but granted the motion based on the insufficiency of the product market. We will assess both potential bases for granting the JNOV. Because the relevant market is essentially a question of fact, the jury's findings concerning the market will be overturned only if clearly erroneous or where there is no evidence to support them. Associated Radio Serv. Co. v. Page Airways, Inc., 624 F.2d 1342, 1348-1349 (5th Cir.1980), cert. denied, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981).
 
 
 21
 We first address the evidence on the geographic dimension. The geographic dimension is the area in which the product or its reasonably interchangeable substitutes are traded. L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 423 (11th Cir.1984). Price data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors must be considered in determining the relevant geographic market. Id. A geographic market is only relevant for monopoly purposes where these factors show that consumers within the geographic area cannot realistically turn to outside sellers should prices rise within the defined area. Id. at 424.
 
 
 22
 The evidence presented at trial on the geographic market is reviewed above at page 820. The district court found THY's evidence sufficient to present a jury question because of the testimony that a customer preference for regional service existed because of the need for emergency deliveries and because the end user pays for transportation costs. On appeal, THY also relies on this evidence to prove the geographic market for recording paper. Such evidence, however, is not sufficient to present a jury question. THY presented no evidence that could support an inference that consumers within the nine-state area could not turn to outside sellers if the prices increased within the nine-state area. In fact, the evidence indicated that consumers could and did turn to outside suppliers. As discussed in Section I.A. above, the prices inside and outside the territory were virtually the same, all suppliers relied on UPS or a similar common carrier for delivery, and delivery costs had little effect on the total cost of the merchandise. Moreover, 6 of the 13 suppliers of Marquette or Marquette-compatible paper to customers in the nine-state area were from outside the southeast area, and two of those outside sellers besides Marquette actually sold Marquette brand paper.
 
 
 23
 We thus find that, even viewing the evidence in the light most favorable to THY, a JNOV was proper on the monopoly claim because of the failure to define the geographic dimension of the market.
 
 
 24
 Even if THY had sufficiently defined a geographic dimension, the JNOV would still be proper because THY failed to provide sufficient proof of the product dimension of the market.
 
 
 25
 [T]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves constitute product markets for antitrust purposes.... The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.
 
 
 26
 Heatransfer, 553 F.2d at 980 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 1523-24, 8 L.Ed.2d 510 (1962)). Citing several cases,[15] THY contends that 200+ bed hospitals, which account for approximately 80% of the purchases by hospitals, constitute such a submarket and are the relevant product market in this case.
 
 
 27
 While a relevant product market can be limited to a portion of customers, such a limitation must be based on a distinction in the product sold to those customers. If, for example, a product is specially designed for a certain group of purchasers and the suppliers concentrate their efforts almost exclusively on those purchasers, as in Heatransfer, 553 F.2d 964, the product dimension may be limited to the sale of that product to those purchasers.[16] 6] Similarly, where one product is distinct from another because of its salability, as in International Boxing Club of New York, Inc. v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959), the relevant market can consist solely of that product.[17] Additionally, where a type of purchaser is relevant because the defendant is such a purchaser, the market can be limited to a type of product that such a purchaser would buy.[18]
 
 
 28
 THY has failed to provide evidence that the market for EKG recording paper should be limited to 200+ bed hospitals because of a distinction in the paper sold to those hospitals. Rather, from this record it appears that the paper used by 200+ bed hospitals, smaller hospitals, clinics, and doctors' offices does not differ. We thus conclude that, even viewing the evidence in the light most favorable to THY, a JNOV on the monopoly claim was proper also because of THY's failure to define the product dimension of the market.[19]
 
 
 29
 B. The Tort Claim: Without Tortious Interference, there is no Tort
 
 
 30
 THY's tort claim relates to damages for lost CHP sales. THY Reply B. at 40 n. 9. The claim for tortious interference with business is a Florida common law claim. To prevail on a claim of tortious interference with a business relationship under Florida law, a plaintiff must establish four elements: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126, 1127 (Fla.1985) (emphasis added). Where the damages are for lost profits, there must be "some standard by which the amount of damages may be adequately determined." W.W. Gay Mechanical Contractor, Inc. v. Wharfside Two, Ltd., 545 So.2d 1348, 1351 (Fla.1989).
 
 
 31
 THY argues that "[e]vidence of Marquette's extensive region-wide interference with Young's business through its telemarketing and service representatives who contacted Young's customers followed by Young's lost sales and decreasing profitability was sufficient to show causation." THY Reply B. at 40. If THY has not really provided evidence of tortious interference by Marquette "telemarketing and service representatives who contacted Young's customers," then the third element obviously fails, and we need not even reach the causation question in the fourth element. We thus must analyze the evidence regarding this alleged interference by Marquette employees.
 
 
 32
 Although THY claims that Marquette's interference was "extensive," THY only introduced evidence regarding statements by Marquette employees at a small number of hospitals in the nine-state southeast region. For six of the hospitals, the evidence THY introduced was the testimony and notes of THY telemarketer Cynthia Cherry and THY general manager William Lofdahl, who allegedly spoke with hospital employees who allegedly spoke with Marquette employees. Because of the importance of this evidence to THY's case, we will discuss in detail why this evidence is inadmissible hearsay.
 
 
 33
 Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The rationale behind the hearsay rule is the untrustworthiness of hearsay statements. United States v. Brown, 548 F.2d 1194, 1205 n. 19 (5th Cir.1977). Hearsay presents substantial risks of insincerity and faulty narration, memory, and perception. Id. (quoting Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177, 218 (1948)).
 
 
 34
 At trial, Cherry testified that she had spoken to a Mr. Brinkley at the V.A. Hospital in Asheville, North Carolina. According to Cherry's testimony, Brinkley told her that he "wanted to try the new brand of CHP paper," but "was told [by Marquette employees] that the printheads would be damaged" and that "the warranty would be completely voided if he used anything but Marquette brand paper." R24-301. A note from Cherry to Lofdahl introduced as an exhibit also indicated the same Marquette statements to Brinkley. THY argues that the statement by Brinkley was not hearsay because it was not offered for the truth of the matter asserted; in fact, THY contends that it specifically denied the truth of the content of the statements.
 
 
 35
 THY misunderstands the hearsay analysis of this evidence. We begin our analysis by noting that the witness (Cherry) was testifying to what another person said outside of court. That other person (Brinkley) is thus the out-of-court declarant. We next address the "matter asserted"--that is, we determine the matter that the declarant (Brinkley) asserted. If the matter asserted were "non-Marquette paper will damage Marquette equipment and void the warranty," THY would be correct in arguing that hearsay does not exist because THY was not trying to prove the truth of the matter asserted; instead, THY was trying to prove that Marquette employees made the comments. Brinkley, however, did not make the above assertion. Rather, the matter Brinkley asserted was (simplified for analysis) "Marquette employees said that non-Marquette paper will damage Marquette equipment and void the warranty." This distinction is critical because THY did try to prove that "Marquette employees said ...;" that is, THY did try to prove the truth of the matter asserted by the declarant. While Brinkley could have testified to what Marquette told him,[20] Cherry's testimony and note are inadmissible hearsay. Because Cherry's testimony and notes regarding the other four hospitals that she contacted follow the same pattern, this evidence is also inadmissible hearsay.[21]
 
 
 36
 The evidence from William Lofdahl suffers from the same fault as the evidence from Cherry. Lofdahl also testified to a conversation he allegedly had with Mr. Brinkley at the V.A. Hospital in Asheville, North Carolina, stating that Brinkley said "that MEI said it [CHP paper] would possibly damage the machine, they wouldn't service the machine if he used our product." R24-326. Lofdahl further testified that he talked to a Sally Morrell from Davie County Hospital in North Carolina, who told him "that MEI service ... told them that CHP-020 paper has a wax coating on it and would damage their new ... systems. And, if they continued to use it MEI would not extend warranty service." PX 50; R24-325. Again, THY has tried through this evidence to prove that "Marquette employees said...." THY has thus in both instances tried to prove the truth of the matter asserted by the out-of-court declarant, and the evidence is consequently inadmissible hearsay.[22]
 
 
 37
 THY also introduced the testimony of Michael Marrow, director of bio-medical engineering at Wake Medical Center in North Carolina, and a phone survey allegedly containing statements by hospital employees. As with Cherry's and Lofdahl's testimony, Marrow testified that another person said to him that a Marquette employee said "[t]hat the warranty might be void if the use of non-Marquette--if we use non-Marquette paper." R13-339-241. We need not repeat our analysis to conclude that this testimony is inadmissible hearsay. In the phone survey, the interviewers allegedly wrote down what hospital employees said Marquette employees said. Neither the hospital employees nor the interviewers are identified, and it is not even clear whether the hospital employees themselves actually spoke with Marquette employees. Again, this evidence is offered to prove that "Marquette employees said ...," and it is inadmissible hearsay.
 
 
 38
 THY argues that even if its evidence is hearsay, the evidence fits under the state of mind exception to the hearsay rule in Fed.R.Evid. 803(3). Fed.R.Evid. 803(3) reads in part as follows:
 
 
 39
 The following are not excluded by the hearsay rule ...:
 
 
 40
 (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind ... (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed.
 
 
 41
 Before a statement can be admitted under Rule 803(3) to show the declarant's then existing state of mind, the declarant's state of mind must be a relevant issue. Prather v. Prather, 650 F.2d 88, 90 (5th Cir. Unit A July 1981). Here, THY admits that it was trying to prove that Marquette employees had made tortious comments. The relevant issue is thus whether Marquette employees made those comments, not the state of mind of the hospital employees. Rule 803(3) is also of no avail to THY because THY tried to use the alleged statements "of memory or belief" by the hospital employees "to prove the fact remembered or believed." That is, THY tried to use the out of court statements that "Marquette said ..." to prove that "Marquette said...." The prohibition against such use of statements "is necessary to avoid the virtual destruction of the hearsay rule." Fed.R.Evid. 803, notes of advisory committee on 1972 proposed rules.[23]
 
 
 42
 The evidence is not admissible under the hearsay exception in Fed.R.Evid. 803(6), either. Fed.R.Evid. 803(6) reads in part as follows:
 
 
 43
 The following are not excluded by the hearsay rule ...:
 
 
 44
 6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation.
 
 
 45
 For this exception to be available, all persons involved in the process must be acting in the regular course of business--otherwise, an essential link in the trustworthiness chain is missing. Fed.R.Evid. 803, notes of advisory committee on 1972 proposed rules. See also Florida Canal Indus., Inc. v. Rambo, 537 F.2d 200, 202-03 & n. 5 (5th Cir.1976) (decided under the former version of the Federal Business Records Act); McCormick on Evidence Sec. 310, at 879 (3d law. ed. 1984). Because it was not the regular course of business for the various out-of-court declarants to report to Cherry, Lofdahl, or the survey interviewers, Rule 803(3) is of no avail to plaintiff.
 
 
 46
 THY conducted a seven-day jury trial that produced reams of trial transcripts and evidence. Nevertheless, THY failed to produce admissible evidence sufficient to support a rational jury determination of tortious interference with business.[24] We thus reverse the district court's denial of Marquette's motion for a JNOV and set aside the jury verdict on the tort claim.[25]
 
 IV. CONCLUSION
 
 47
 For the foregoing reasons, the district court's grant of JNOV on the tying claim and on the monopoly claim is AFFIRMED. The district court's denial of JNOV on the tort claim is REVERSED.
 
 
 
 [1]
 Because of the cross-appeal, both parties are appellants. For convenience, we thus will refer to "plaintiff" and "defendant" throughout the opinion
 
 
 [2]
 Pursuant to a written agreement terminable on thirty days notice, THY also acted as a commissioned sales agent for Marquette EKG and stress testing equipment. Marquette terminated this agreement as of October 31, 1987. THY does not claim that the termination was unlawful
 
 
 [3]
 THY does not contend that it was unlawful for Marquette to compete against THY in the southeast region
 
 
 [4]
 Both sides cite the trial court record in support of their respective positions and accuse each other of misstating the record. This court does not take such accusations lightly. Attorneys needlessly waste a court's time where they misstate the record or wrongfully accuse another of doing so. The considerable number of factual disputes on this appeal are particularly disconcerting. We here only review a few of them
 THY claims at page 9 of its opening brief that Timothy Mickelson, a Marquette division manager, "described Marquette's suggestion that paper caused printhead problems as 'comical.' " This statement by THY is certainly misleading, if not a misstatement of the record. Mickelson actually testified:
 A: "... the basic premise that you're going to put in one or two rolls of paper and have print head problems immediately is sort of comical."
 Q: Can paper cause print head problems?
 A: Yes.
 R13-339-381-382.
 THY also alleges at pages 11-12 of its opening brief that Marquette's president, Michael Cudahy, testified (at R22-1530-1531) that customers were advised that "if Young's paper or a non-Marquette paper was used that it would or might cause equipment problems and that warranties and service contract protection would be 'no good' or might be voided." Citing Cudahy for this proposition misstates the record. Cudahy did not testify that using Marquette paper would cause problems, or that Marquette employees made such a representation to customers. Cudahy merely testified that there was an unofficial policy "that Marquette would charge for replacement of more than one thermal printhead damaged by the use of non Marquette paper." R22-1530-1531.
 THY also cites the testimony of an independent field engineer who serviced Marquette machines, David Morton, (at R21-1072-1073) in support of the above statement at pages 11-12 of its brief. Again, THY misstates the record. Morton did not testify about warranties and service contract protection. Morton simply testified that thermal stripe paper had caused problems in Marquette machines and that Graphics Control paper (another brand of paper) still does cause problems in Marquette machines. R21-1072-1073.
 We could continue to point out misrepresentations of the record, but do not feel that such a process is a judicious use of this court's time. We do, however, note that Marquette's accusations regarding misstatements of the record are not all correct. For example, THY at page 9 of its opening brief cites the testimony of Marquette technical services manager James Schmidt at R21-1129-1130 for the proposition that Schmidt testified "that it was not realistic to believe that a printhead would be destroyed by paper." Marquette attacks THY's citation at footnote 1 of its opening brief. However, Schmidt did admit at THY's record citation that the following exchange regarding a report by Schmidt had taken place at his deposition:
 Question: At the foot of this page you wrote, and I quote, Kent felt that heads were being destroyed. I am not sure that is realistic, unquote.
 Why did you say that, quote I am not sure that is realistic, unquote?
 Answer: Because I have never personally witnessed a printhead being destroyed by paper.
 R21-1129-30. This exchange sufficiently supports THY's citation.
 We admonish the attorneys here to refrain from future misstatements to courts in this circuit.
 
 
 [5]
 There was evidence that paper sellers outside the region sold paper at a marginally greater price (from .6% higher to 5.1% higher)
 
 
 [6]
 Leon Moses, a defense witness, testified that shipping costs as a percentage of the total cost varied from 1.9% to 4%
 
 
 [7]
 Plaintiff sent a survey to suppliers for the southeast area, 13 of whom responded that they sold Marquette or Marquette compatible paper. The six out-of-region suppliers were from California, Michigan, New York, and Wisconsin (Marquette). The non-Marquette suppliers of Marquette brand paper were from California and Michigan
 
 
 [8]
 Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. Sec. 1 (1988). Section 2 forbids certain monopolies: "Every person who shall monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States ... shall be deemed guilty of a felony." 15 U.S.C. Sec. 2 (1988)
 
 
 [9]
 The trial judge instructed Young that it could only recover on one of the counts, however, in order to avoid double recovery for the same wrong
 
 
 [10]
 The cases cited by plaintiff in support of its theory that a defendant need not withhold product A are not helpful to plaintiff. In those cases, the defendant allegedly threatened to withhold one product unless the buyer also selected another product. See, e.g., Advance Business Sys. and Supply Co. v. SCM Corp., 415 F.2d 55, 64 (4th Cir.1969) (among other things, defendant threatened cancellation of copier rental agreements unless customers used defendant's supplies), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970); Heatransfer Corp. v. Volkswagenwerk, A.G., 553 F.2d 964, 975-79 (5th Cir.1977) (Volkswagen of America required distributors and dealers to purchase certain air conditioners as a condition to their also purchasing Volkswagen automobiles), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); Tic-X-Press, 815 F.2d at 1416 (lease of sports and entertainment facility conditioned upon use of certain ticketing service)
 All of the tying cases that we have found concern factual situations where the defendant has allegedly withheld, or threatened to withhold, product A. See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (to receive surgery at hospital, patients had to obtain anesthesiological services from firm designated by hospital); Fortner Enters., Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (plaintiff alleged that as a condition of obtaining certain loans from defendant for purchase and development of land, plaintiff had to agree to erect pre-fabricated house manufactured by parent on each of the lots purchased with loan proceeds); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) (lease of defendant's equipment conditioned upon purchase of salt from defendant); International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936) (lease of IBM machines conditioned upon use of IBM tabulating cards); Amey, 758 F.2d 1486 (plaintiff contended that loan from bank was conditioned upon use of certain lawyers for title search); Olmstead v. Amoco Oil Co., 725 F.2d 627 (11th Cir.1984) (lease of Amoco service station allegedly conditioned upon purchase of car wash); Kypta, 671 F.2d 1282 (as a condition of obtaining McDonalds franchise, plaintiffs were required to execute lease agreement for restaurant premises); Faulkner Advertising Assocs. v. Nissan Motor Corp., 905 F.2d 769 (4th Cir.1990) (plaintiffs alleged that, as a condition of purchasing automobiles from Nissan, Nissan required dealers to purchase services relating to the advertising of Nissan automobiles by a certain ad agency); Beard v. Parkview Hosp., 912 F.2d 138 (6th Cir.1990) (to receive surgery at hospital, patients had to obtain radiological services from hospital-designated provider).
 
 
 [11]
 Under plaintiff's theory, a tying arrangement is by definition illegal. It is, however, easy to imagine legal tying arrangements. As the Supreme Court has explained, "if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself." Northern Pacific Ry., 356 U.S. at 7, 78 S.Ct. at 519. Similarly, the Court has noted that "a seller who ties the sale of houses to the provision of credit simply as a way of effectively competing in a competitive market does not violate the antitrust laws." Jefferson Parish, 104 S.Ct. at 1558 n. 18 (referring to the credit bargain offered to Fortner in United States Steel Corp. v. Fortner Enters., Inc., 429 U.S. 610, 97 S.Ct. 861, 868, 51 L.Ed.2d 80 (1977))
 
 
 [12]
 As the Supreme Court has explained, tying arrangements are condemned "when the seller has some special ability--usually called 'market power'--to force a purchaser to do something that he would not do in a competitive market." Jefferson Parish, 104 S.Ct. at 1559
 
 
 [13]
 Tying arrangements with these attributes are illegal per se because they "exhibit a high likelihood of anticompetitive impact and offer virtually no prospect at all of enhancing competition." Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 374 (5th Cir.1977)
 
 
 [14]
 For the relevant text of the statute, see supra note 8
 
 
 [15]
 See, e.g., Heatransfer, 553 F.2d 964, International Boxing Club of New York, Inc. v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959), Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291 (9th Cir.), cert. denied, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982). These cases are discussed in the text and footnotes below
 THY also cites United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), overruled, Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (overruling intra-enterprise conspiracy doctrine begun in Yellow Cab ). The Supreme Court in Yellow Cab upheld the sufficiency of a complaint that charged, among other things, that the defendants had established control over a substantial segment of the entire market of cab operations in four cities (86% of the Chicago market, 15% of the New York City market, 100% of the Pittsburgh market, and 58% of the Minneapolis market) and had exploited its control by extracting exclusive purchasing agreements from its owned cab companies, thus excluding other cab manufacturers from the affected market. 67 S.Ct. at 1564-65. THY argues that the market in our case can be limited to 200+ bed hospitals because they too are the "principal consumers when it comes to the purchase of paper." THY misinterprets Yellow Cab. Yellow Cab is irrelevant to the concept of limiting a product market to a portion of customers and then determining the percentage of that limited market held by the defendant. The plaintiff in Yellow Cab did not try to limit the market to a segment of customers and then allege that the defendant's percentage of control of that limited market resulted in a monopoly; rather, in essence, the plaintiff alleged that the defendant controlled a certain percentage of cab sales in the entire market in the four cities. Moreover, even if the plaintiff had tried to limit the market, the Supreme Court merely held that the plaintiff could go forward and attempt to prove its allegations on the merits; the Court did not rule on whether the plaintiff had sufficiently proven its allegations.
 
 
 [16]
 In Heatransfer, the jury found that the relevant market consisted of the sale of air conditioners for only Volkswagen, Porsche, and Audi automobiles (all imported by Volkswagen of America), rather than the sale of air conditioners for all automobiles. The court of appeals affirmed the jury's finding based on evidence that the companies selling air conditioners for those cars concentrated almost exclusively on those cars because of the distinct engineering problems associated with the Volkswagen imports. Id. at 980. Citing Heatransfer, THY argues that its evidence that sales efforts were concentrated on 200+ bed hospitals is sufficient to uphold the jury's finding of a market limited to 200+ bed hospitals. This argument, however, misstates the teaching of Heatransfer. That case stands for the proposition that where suppliers specially design a product for a certain group of purchasers and concentrate their sales efforts almost exclusively on that group of purchasers, a relevant market can exist consisting of the sale of that product to those purchasers. In our case, by contrast, EKG recording paper is not designed for 200+ bed hospitals; rather, there is no difference in the paper sold to those hospitals from that sold to smaller hospitals, clinics, and doctors' offices. Heatransfer thus does not advance THY's argument
 
 
 [17]
 Contrary to THY's assertion, the market in International Boxing was limited based on a distinction in the product, not on a distinction in the customers. In International Boxing, the two products were championship boxing contests and nonchampionship boxing contests. The district court found that the relevant market consisted of championship boxing contests instead of all professional boxing events. 79 S.Ct. at 247. Because of the detailed findings regarding the salability of championship boxing contests as opposed to nonchampionship fights, the Supreme Court determined that the district court was not clearly erroneous "in concluding that nonchampionship fights [were] not 'reasonably interchangeable for the same purposes' as championship contests." Id. at 250. The product in our case is EKG recording paper. Because there is no distinction between paper sold to 200+ bed hospitals and paper sold to smaller hospitals, clinics, and doctors' offices, International Boxing does not support THY's attempted limitation of the market to 200+ bed hospitals
 
 
 [18]
 In Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291 (9th Cir.), cert. denied, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982), the relevant type of purchaser was national concessionaires because appellant Sportservice was a national concessionaire, and the product was concession franchises. The district court limited the product market to the 118 concession franchises for which national concessionaires would compete (because of the net profits or gross receipts those franchises yielded), instead of including all grill-size or smaller franchises, and the Ninth Circuit affirmed. Id. at 1300. THY points out that the concession franchises were "distinct purchasers of concessionaire services," seemingly implying that the market in our case could thus also be limited to certain purchasers (200+ bed hospitals). THY misunderstands Twin City Sportservice. The concession franchises simply cannot be compared with 200+ bed hospitals because the former were a product, while the latter are purchasers of a product
 
 
 [19]
 Because of our disposition of the antitrust issues, we need not also address Marquette's attack on THY's antitrust damages model
 
 
 [20]
 Brinkley's testimony on this subject would not have been hearsay because THY would not have been trying to prove the truth of the matter asserted ("non-Marquette paper will damage Marquette equipment and void the warranty") by the declarant (Marquette employees). For what Brinkley did permissibly testify to, see note 24
 
 
 [21]
 Cherry testified at trial that she had spoken to a Mary Torrance at Myrtle Beach Air Force Base. According to Cherry, Ms. Torrance told her that Marquette employees "had told her that we were practically nonexistent, that we were not able to sell them supplies." R24-303. Again, THY also introduced a note from Cherry of this conversation as an exhibit. Cherry also testified that she spoke to a woman named Selma at East Jefferson Hospital who told her that East Jefferson "had been told by Marquette that they could not use another paper, meaning the CHP brand, that they had to go back to purchasing the Marquette brand." R24-304. Again, THY introduced a note from Cherry of the conversation. At Betsy Johnson Hospital, Cherry testified that Arlene said that she was told that the "generic paper ... was not able to be used in her machine, that something would go wrong with it, that she had to change it back to the Marquette brand." R24-305. THY also introduced Cherry's note of this conversation. THY also introduced a note from Cherry of a conversation she allegedly had with a Maria Bullock at Trident Regional Medical Center. According to Cherry, Ms. Bullock said that Marquette said in a memo that the hospital "should buy thier [sic] supplies from them only." PX 49; R24-310
 
 
 [22]
 We note that Sally Morrell, like Brinkley at the V.A. Hospital in Asheville, could also have testified to what Marquette employees personally told her. Morrell's deposition testimony, however, reveals that her exclusive source of information about what Marquette employees said is what the nursing director at the hospital said to her. As can be gathered from our hearsay analysis in the text, Morrell's testimony about what Marquette employees said is inadmissible hearsay
 
 
 [23]
 The cases THY cites are unavailing. See, e.g., Morris Jewelers, Inc. v. General Elec. Credit Corp., 714 F.2d 32, 34 (5th Cir.1983) (recognizing that Rule 803(3) does not authorize admission unless declarant's state of mind is relevant, and finding that the declarants' states of mind in that case were relevant); Herman Schwabe, Inc. v. United Shoe Mach. Corp., 297 F.2d 906, 914 (2nd Cir.1962) (recognizing that statement of a customer as to his reason for not dealing with a supplier was not usable as evidence of the facts recited), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962); Hydrolevel Corp. v. American Soc'y of Mechanical Eng'rs, Inc., 635 F.2d 118, 128 (2nd Cir.1980) (customer statements admitted because offered only to prove reason for not dealing with supplier), aff'd, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982)
 
 
 [24]
 The remaining evidence of Marquette employee contact with THY customers includes the testimony of Mr. Brinkley from the V.A. Hospital in Asheville. Mr. Brinkley merely testified (through a deposition introduced at trial) that Marquette employees had told him that some types of paper had caused problems with printheads and that warranty coverage would not be provided where such problems occurred. R13-339-37. He also testified that Marquette employees said "it might be possible to use a lot of different types of paper." Id. (It will be recalled from page 826 above that Cherry's testimony was offered to the effect that Brinkley had told Cherry that Marquette employees had told him that only Marquette paper could be used. We now see that Brinkley's own testimony, which is not hearsay, is that Marquette employees made no such threats. Tenuously, one might argue for the admissibility of the Brinkley statement to Cherry as being material to the credibility of Brinkley--as being a statement inconsistent with his trial testimony. See United States v. Sisto, 534 F.2d 616, 622-23 (5th Cir.1976). The admission of his statement to Cherry on such a ground would not aid THY in establishing evidence of threats. The inconsistent statement might well go to credibility, but it is not admissible to support the truth of the inconsistent statement. See id.)
 The evidence also includes the testimony of Kathryn Lloyd, a purchasing department employee at North Broward Medical Center who signed a change order from CHP to Marquette paper. Her testimony is not helpful to THY, as Ms. Lloyd never spoke to any Marquette employee about the change order. R13-339-204. THY also cites the testimony of Sharon Popeil, an EKG technician at North Broward Medical Center. THY's record citation, R21-1023, does not support its contention that Marquette employees told the hospital that use of non-Marquette paper could result in a loss of warranty and of service contracts. Popeil did testify that Marquette service personnel said that the problems with their equipment were caused by the paper. Popeil, though, also seems to have concluded independently that the equipment problems were caused by the paper. Referring to the CHP paper earlier in her testimony, she stated that it "was causing our machines to break down," R21-1018, and went on to comment that "when I went to feel the paper, and when we went to load it, it was much thinner than paper we had used in the past," R21-1019, and to note that she experienced no problems with the equipment after switching to Marquette paper. R21-1020.
 THY also cites the testimony of some present and former Marquette employees. The two former employees are division manager Timothy Mickelson and plant manager David Taylor. Mickelson testified that Marquette employees had advised some customers that they were better off using Marquette paper, but also added that "[t]hat type of response grew out of the service department, mainly from the problems that we had with Graphics Controls paper [ (not CHP paper) ]." R13-339-342. Mickelson also testified that he could not even remember any specific customers who had been so advised. R13-383. Taylor testified on direct that Marquette general manager Terry Johnson told him that he had instructed the Marquette telemarketers to tell customers that if they used non-Marquette paper their warranty and service contract would be "no good." R25-399-400. While this testimony tends to support THY's position, it is insufficient because Taylor testified he had no knowledge about what was actually said to customers, R25-408, and because Taylor also testified that Terry Johnson had told him that the telemarketers were instructed to tell customers that "if print heads burned out and they were using non-Marquette paper, it wouldn't be under the warranty." R25-407. This discrepancy in what Johnson told Taylor is important because only the former testimony supports THY's position.
 The testimony of the present Marquette employees is that of senior account representative Tina Calenberg and senior field service engineer Kent McSwain. Calenberg testified, among other things, that she saw a letter stating in part that if a customer was "using a competitor's paper and the printhead was burnt out because of that we would replace it free of charge the first time." R13-339-76. Neither this testimony nor any other of Calenberg's testimony amounts to Marquette employees stating that THY's CHP paper would damage equipment or void the equipment warranty. McSwain's testimony does not support this proposition either--he merely testified that Marquette had a policy of charging for the replacement of more than one thermal printhead if that printhead had been damaged by the use of non-Marquette paper. R13-339-293, 296, 308-10. THY also points to a letter dated October 29, 1986, from Marquette president Michael Cudahy to Harris Young and another Marquette distributor. This letter is also unhelpful to THY, as Cudahy stated merely that he recognized that other suppliers might tempt them with their products, that not all thermal papers are the same, and that Marquette would be cautioning customers "about potential damage to their equipment, for example, from improper chart paper." PX18. Cudahy did not threaten to tell customers that THY's CHP paper would damage their equipment or threaten to void warranties.
 
 
 [25]
 Because of our disposition of the tort claim, we need not address certain other issues raised by the parties concerning the calculation of lost profits and the jury instruction on punitive damages